**The HANLESTER NETWORK, et al., Plaintiffs–Appellants,**

v.

**Donna E. SHALALA, Secretary of the Department of Health and Human Services, Defendant–Appellee.**

No. 93–55351.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 11, 1994.

Decided April 6, 1995.

Patric Hooper, W. Bradley Tully, Hooper, Lundy & Bookman, Inc., Los Angeles, CA, for all plaintiffs-appellants other than plain-

tiff-appellant Melvin Huntsinger, M.D.; Martin Krawiec, Fullerton, CA, for plaintiff-appellant Melvin Huntsinger, M.D.

Larry J. Goldberg and John J. Meyer, Inspector Gen. Div., Dept. of Health and Human Services, Washington, DC, for defendant-appellee.

Before: POOLE and REINHARDT, Circuit Judges, and TANNER,* District Judge.

TANNER, Senior District Judge:

Plaintiffs/appellants appeal the district court's grant of summary judgment in favor of the Secretary, and denial of plaintiffs/appellants motion for summary judgment.

The issues presented are whether appellants violated the provisions of the Medicare–Medicaid anti-kickback statute by (1) offering or paying remuneration to physician limited partners to induce the referral of program-related business to limited partnership laboratories, or (2) soliciting or receiving remuneration "in return for" referrals by virtue of their management agreement with Smithkline BioScience Laboratories (SKBL), and whether the Secretary of the Department of Health and Human Services (Secretary) erred in excluding appellants from Medicare and Medicaid participation for various periods due to alleged violations of the Medicare/Medicaid anti-kickback statute, 42 U.S.C. § 1320a–7b(b).

In order to resolve these issues, we must determine (1) whether the Secretary properly interpreted the Medicare/Medicaid anti-kickback statute in the context of health care joint ventures, (2) whether the statute is unconstitutionally vague as applied to the facts of this case, and (3) whether appellants knowingly and willfully committed the acts which are alleged to violate the anti-kickback statute. We have jurisdiction pursuant to 42 U.S.C. § 1320a–7(f)(1) and 405(g). We AFFIRM in part and REVERSE in part.

## FACTS

In 1987, The Hanlester Network (Hanlester), a California general partnership, was formed. The original general partners in Hanlester were the Hanlester Corporation, James A. Padova, M.D., Inc., a California medical corporation, Gene Tasha, and Ned Welsh.[1] The Hanlester Corporation owned the majority interest in the Hanlester Network prior to 1989.

Kevin Lewand served as President of Hanlester until January 1989, while Tasha served as Vice President of Operations, Patricia Hitchcock served as Hanlester's Vice President of Marketing until November 1988, and Welsh served as Vice President, Business Development, and a general partner at Hanlester. Welsh ceased being a general partner or executive in Hanlester in the summer of 1987. In January 1989, the Hanlester Corporation sold its interest in the Hanlester Network to Tasha, and was renamed the Keorle Corporation.

On April 9, 1987, Hanlester and SKBL entered into a master laboratory service agreement. In that agreement, SKBL agreed to provide laboratory management services to all joint venture laboratories in which Hanlester had an ownership interest.[2] Hanlester had exclusive authority to make all management decisions for Placer, PPCL, and Omni.

Between March 1987 and March 1988, Hanlester issued private placement memoranda offering limited partnership shares in PPCL, Placer, and Omni. The purpose of the private placement memoranda was to offer limited partnership shares in joint venture laboratories. Hanlester marketed limited partnership shares, and offered investors

---

* The Honorable Jack E. Tanner, Senior United States District Judge for the Western District of Washington, sitting by designation.

1. Appellants in this case (Respondents below) are: The Hanlester Network (Hanlester); the Keorle Corporation (Keorle); Pacific Physicians Clinical Laboratory (PPCL); Omni Physicians Clinical Laboratory, Ltd. (Omni); Placer Physicians Clinical Laboratory, Ltd. (Placer); Kevin Lewand, Gene Tasha, Melvin L. Huntsinger, M.D., and Ned Welsh.

2. Hanlester had an interest in Respondents Omni, Placer and PPCL.

partnership shares in Omni, Placer, and PPCL for a minimum three shares at $500 each. On July 27, 1987, SKBL entered into a laboratory management agreement with PPCL. The agreement required PPCL to provide the services of a licensed Medical Director, and to pay SKBL a monthly management fee of $15,000 or 80% of all net cash receipts, whichever was greater.[3] Hanlester and SKBL entered into a laboratory support services agreement in which Hanlester would set up and service client accounts for PPCL.

Subsequently, SKBL executed laboratory management agreements with the other Hanlester laboratories under which SKBL agreed to supervise their administrative and operational activities; provide and compensate all staff to operate them; provide and maintain all lab equipment not already provided by the labs; and to conduct all billing and collection activities for them. In accordance with these agreements, 85 to 90% of tests physicians ordered from the Hanlester labs were performed at SKBL facilities in California.

Hanlester was notified by the Inspector General (I.G.) of the Department of Health and Human Services (DHHS) in December 1989 that he had determined that the Hanlester respondents (hereafter referred to as appellants) had violated § 1128B(b)(2) of the Social Security Act (the Act) by offering and paying remuneration to physician-investors to induce them to refer laboratory tests to the three Hanlester laboratories. The Hanlester appellants were also told they had violated § 1128B(b)(1) of the Act by soliciting and receiving payments from SKBL in return for referrals of lab tests, and that it would be proposed that all of the appellants be excluded from the Medicare and state health care programs under § 1128(b)(7) for varying periods of time.[4] The Hanlester appellants requested a hearing on the proposed exclusions before an Administrative Law

Judge (ALJ).[5] An evidentiary hearing was conducted and the ALJ issued his initial decision March 1, 1991. The ALJ concluded that appellants Hanlester, PPCL, Placer, and Omni violated § 1128B(b)(2) through the actions of their agent, Patricia Hitchcock, while Lewand, Tasha, Welsh, Huntsinger and Keorle had not. The ALJ also concluded that none of the appellants knowingly and willfully solicited or received any remuneration for referring program-related business in violation of § 1128B(b)(1) of the Act. The ALJ declined to impose permissive exclusions from Medicare or Medicaid based on the violations. The I.G. then appealed to an Appellate Panel of the Departmental Appeals Board (DAB), alleging error in nine of the ALJ's 227 findings and conclusions. On September 18, 1991, the DAB reversed all findings excepted to by the I.G., remanded the matter to the ALJ for further proceedings consistent with its determination concerning the applicable legal standard, and instructed the ALJ as to the factors to consider in determining whether an exclusion ought to be imposed.

In its March 1992 Decision on Remand, the ALJ found that all nine appellants had violated § 1128B(b)(2) of the Social Security Act by knowingly and willfully offering or paying remuneration to physicians to induce them to refer program-related business. The ALJ also found that all appellants except Welsh and Huntsinger violated § 1128B(b)(1) by knowingly and willfully soliciting or receiving remuneration in return for referring program-related business. The ALJ further concluded that permissive exclusions under § 1128(b)(7) were necessary for some, but not all appellants.[6]

In the DAB's July 1992 Final Decision, the DAB affirmed the ALJ's findings and conclusions with respect to the violations by appellants, but vacated his decision not to impose exclusions on all appellants. Hanlester ap-

---

**3.** SKBL subsequently entered into the same fee arrangement with Omni and Placer.

**4.** Section § 1128(b)(7) of the Social Security Act, 42 U.S.C. § 1320a–7(b), authorizes permissive exclusions from Medicare (Title XVIII of the Act) and several "State health care programs" including Medicaid (Title XIX of the Act) for any indi-

vidual or entity which violates § 1128B(b) of the Act.

**5.** Patricia Hitchcock is not a party to this lawsuit.

**6.** No exclusions were imposed for Lewand, Tasha, Welsh, Huntsinger, and Keorle.

pealed to the district court and moved for summary judgment, and the Secretary cross-claimed for summary judgment. The district court granted the Secretary's motion for summary judgment, and denied appellants' motion for summary judgment. Appellants timely appealed.

## I. *Standard of Review*

■ We review the decision of the district court affirming the Secretary's final decision *de novo. Gamer v. Secretary of Health and Human Services,* 815 F.2d 1275, 1278 (9th Cir.1987). Summary judgment is appropriate if, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). We must affirm if the Secretary correctly applied the law, and the Secretary's findings are supported by substantial evidence. *Brawner v. Secretary of Health and Human Services,* 839 F.2d 432, 433 (9th Cir.1988). In reviewing the evidence, this court must examine the administrative record as a whole. *Davis v. Heckler,* 868 F.2d 323, 326 (9th Cir.1989).

## II. *Analysis*

This is the first instance in which physician self-referral joint ventures have been challenged under the Act, and in which the Act has been applied to arrangements other than kickbacks, bribes, or rebates, as a basis for excluding persons from participation in Medicare/Medicaid programs.

Nothing in the language of the statute itself prohibits joint venture arrangements. We must, therefore, look to the legislative history, the Act's purpose and context to determine whether such arrangements violate the statute.

### *The Statute*

■ Congress, concerned with escalating fraud and abuse in the Medicare–Medicaid system, amended the misdemeanor anti-kickback statute in 1977 to strengthen the government's ability to prosecute and punish

fraud in the system. Language was added prohibiting (1) the solicitation or receipt of "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind," in return for referrals, and (2) the offer or payment of such remuneration to "induce" referrals. Medicare–Medicaid Anti-fraud and Abuse Amendments, Pub.L. No. 95–142, 91 Stat. 1175, 1182 (1977). Congress also upgraded the violation to a felony.[7]

In 1987, Congress consolidated the anti-kickback laws for Medicare and state health care programs into § 1128B(b) of the Social Security Act, 42 U.S.C. § 1320a–7b. Also through amendment, Congress authorized the exclusion from Medicare or Medicaid program participation of individuals or entities found by the Secretary to have committed an act proscribed by § 1128B(b) of the Act. Medicare and Medicaid Patient and Program Protection Act of 1987, Pub.L. No. 100–93, 101 Stat. 680, 681–682, 689.

Both § 1128B(b)(1), which prohibits solicitation or receipt of remuneration "in return for" the referral of program-related business, and (b)(2), which proscribes offers or payments of remuneration "to induce" referrals of program-related business, are implicated here.

### *Proof of Agreement*

We first address the threshold question of whether proof of an agreement is required to establish a violation of either subsection of the anti-kickback statute.

The courts have not held that proof of an agreement to refer program-related business is a prerequisite to establishing a violation of § 1128B.

The cases which appellants rely on involve interpretations of former bribery statute 18 U.S.C. § 201. They do not support appellants' contention that the "in return for" language in § 1128B(b)(1) is contract-type language which contemplates a *quid pro quo,*

---

**7.** The previous amendments made it a misdemeanor to solicit, offer, or receive a "kickback, bribe, or rebate" in connection with furnishing covered services or referring a patient to a pro-

vider of those services. Social Security Amendments of 1972, Pub.L. No. 92–603, § 242(b), (c), 86 Stat. 1419.

which in turn implies a promise, contract, or agreement.[8]

In *United States v. Strand,* 574 F.2d 993, 995 (9th Cir.1978), this court focused on the mens rea required for a violation of the bribery statute, defining "corrupt intent" as "incorporating a concept of the bribe being the prime mover or producer of the official act." *Id.* at 996. The court recognized that the inducement to commit the violation was the bribe, i.e., the *quid pro quo.* It did not indicate that the *quid pro quo* had to take the form of an agreement.

Similarly, In *United States v. Johnson,* 621 F.2d 1073, 1076 (10th Cir.1980), the focus was again on the inducement factor. The Tenth Circuit held that to establish the crime of offering a bribe under § 201(b)(1), the government must show that the money was knowingly offered to an official with the intent and expectation that, in exchange for the money, some act of a public official would be influenced.[9] *Id.* Neither case construed "in return for" as a quid pro quo which implies a promise, contract or agreement.

■ While admitting that subsection (b)(2) of the anti-kickback statute does not contain the "in return for" language, appellants contend that Congress meant the crime of soliciting or receiving remuneration under (b)(1), and the crime of offering or paying under (b)(2), to have the same elements for payor and payee. They infer from this that a *quid pro quo* imposed on (b)(1) should be applied to (b)(2) as well. *See United States v. Bay State Ambulance & Hospital Rental Srvc.,* 874 F.2d 20, 34 (1st Cir.1989). Since we reject the proposition that proof of an agreement is necessary under § 1128B(b)(1), we must reject appellants' argument that the same requirement is imposed on § 1128B(b)(2).

■ When interpreting statutes, the starting point is the language of the statute itself. *Ardestani v. INS,* 502 U.S. 129, 134, 112 S.Ct. 515, 519, 116 L.Ed.2d 496 (1991). There is no reference to an agreement in the statute. "[W]hen a statute speaks with clarity to an issue[,] judicial inquiry into the statute's meaning, in all but the most extraordinary circumstances, is finished." *Estate of Cowart v. Nicklos Drilling Co.,* —— U.S. ——, ——, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992). Canons of statutory construction, such as the Rule of Lenity, are employed only where "reasonable doubt persists about a statute's intended scope even *after* resort to 'the language, and structure, legislative history and motivating policies' of the statute." *Moskal v. United States,* 498 U.S. 103, 108, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990), (quoting *Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980)).

There is no basis in the statute, case law or legislative history to require an agreement to refer program-related business.[10]

*Vagueness*

Appellants claim that the statute does not give fair warning of the standards by which their conduct is to be judged.[11]

The Supreme Court has stated that a "criminal statute must be sufficiently definite to give notice of the required conduct to one who would avoid its penalties." *Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337,

---

8. Prior to an amendment in 1986, former 18 U.S.C. § 201(c)(3) made it a crime for a public official to "corruptly" accept anything of value "in return for being induced to do or omit to do" any act in violation of his official duty.

9. Former § 201(b) made it a crime to "corruptly" offer or give anything of value with intent to induce or influence an official act.

10. Appellants also rely on *McCormick v. United States,* 500 U.S. 257, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991), involving a Hobbs Act violation. In *McCormick,* the Supreme Court was construing the definition of "extortion", not the phrase "in return for" as Appellants claim. While requiring

a *quid pro quo* in the form of an explicit promise in the context of the receipt of campaign contributions in return for sponsoring legislation, the Court stressed it was "not decid[ing] whether a *quid pro quo* requirement exists in other contexts." *Id.* at 274, n. 10, 111 S.Ct. at 1817, n. 10.

11. Appellants claim that vagueness is inherent in the statute because of "uncertainty" resulting from "interpretations" supposedly issued by HHS in the early 1980's, correspondence from the OIG to the author of the Stark Bill regarding the task of drawing clear lines of demarcation between lawful and unlawful acts," and the adoption of "safe harbor" regulations.

340, 72 S.Ct. 329, 330–31, 96 L.Ed. 367 (1952).

In *Village of Hoffman Estates v. The Flipside,* 455 U.S. 489, 498–500, 102 S.Ct. 1186, 1193–94, 71 L.Ed.2d 362 (1982), the court enumerated four factors affecting a vagueness inquiry, including whether or not the statute at issue (1) involved only economic regulation, (2) contained only civil, not criminal penalties, (3) contained a scienter requirement, which might mitigate any vagueness, and (4) threatened any constitutionally protected rights. *Id.* at 498–99, 102 S.Ct. at 1193.

These factors militate against finding the anti-kickback statute void for vagueness. The statute regulates only economic conduct. It chills no constitutional rights. While the statute allows for criminal penalties, it requires "knowing and willful" conduct, a requirement which mitigates any vagueness in the statute. *Bay State Ambulance,* 874 F.2d at 32–33.

In cases construing earlier versions of the anti-kickback statute, the courts held that the statute was not unconstitutionally vague.[12] The current version of the statute gives us even greater guidance, having been amended in 1977 to clarify the scope of the statute. The statute gives fair warning of what is prohibited and is not unconstitutionally vague.

*Offer or Payment to Induce Referrals*

The Secretary claims that appellants knowingly and willfully engaged in conduct which violated the anti-kickback laws. We address the subsection (b)(2) violation first.

In order to find a violation of § 1128B(b)(2) of the Social Security Act (42 U.S.C. § 1320a–7b(b)(2)), we must conclude that appellants knowingly and willfully offered or paid remuneration to induce referrals of program-related business.[13]

*Remuneration*

Congress introduced the broad term "remuneration" in the 1977 amendment of the statute to clarify the types of financial arrangements and conduct to be classified as illegal under Medicare and Medicaid. H.R.Rep. No. 95–393, Pt. II, 95th Cong., 1st Sess. 53 *reprinted in* 1977 U.S.C.C.A.N. 3039, 3056. The phrase "any remuneration" was intended to broaden the reach of the law which previously referred only to kickbacks, bribes, and rebates.

*Inducement*

Appellants argue that the term "induce" is synonymous with "to encourage", and that encouragement is not prohibited by the statute. Appellants are correct that mere encouragement would not violate the statute. However, the term "induce" is not defined simply by reference to influence or encouragement.

The term "induce" has been defined as follows: to bring on or about, to affect, cause, to influence to an act or course of conduct, lead by persuasion or reasoning, incite by motives, prevail on. *Black's Law Dictionary,* 697 (6th ed. 1990).

The Secretary determined that the phrase "to induce" in § 1128B(b)(2) of the Act connotes "an intent to exercise influence over the reason or judgment of another in an effort to cause the referral of program-related business". We agree with this interpretation. We now look to the conduct of the parties to determine whether the statute was violated.

---

12. *See United States v. Perlstein,* 632 F.2d 661 (6th Cir.1980), and *United States v. Tapert,* 625 F.2d 111 (6th Cir.1980), interpreting 42 U.S.C. § 1396h(b)(1) of the Social Security Act.

13. The relevant portions of § 1128B(b)(2) read:

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

\* \* \* \* \* \*

(B) to purchase, lease, order or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under [Medicare or Medicaid], shall be guilty of a felony ...

*Hanlester Appellants*

The I.G. argued that appellants unlawfully induced referrals in the way in which they marketed the limited partnerships.[14]

At the time appellants entered into the management agreements, these types of arrangements were fairly common. Health care joint ventures such as that entered into by appellants were not per se unlawful. The evidence shows that Hanlester desired to comply with the law and structured its business operation in a manner which it believed to be lawful. There is ample evidence that appellants intended to encourage limited partners to refer business to the joint venture laboratories. The appellants offered physicians the opportunity to profit indirectly from referrals when they could not profit directly. Potential partners were told that the success of the limited partnerships depended on referrals from the limited partners. While substantial cash distributions were made to limited partners by the joint venture labs, dividends were paid to limited partners based on each individual's ownership share of profits, and not on the volume of their referrals. Payments were made to limited partners whether or not they referred business to the joint venture labs.

■■■ The fact that a large number of referrals resulted in the potential for a high return on investment, or that the practical effect of low referral rates was failure for the labs, is insufficient to prove that appellants offered or paid remuneration to induce referrals. The conduct of Patricia Hitchcock, however, is another matter.

Hanlester told prospective limited partners of the joint venture labs that the private placement memoranda issued for the limited partnerships were the only sales material

which could be used in connection with the sale of shares. In spite of this, Ms. Hitchcock implied that eligibility to purchase shares depended on an agreement to refer program-related business; told prospective limited partners that the number of shares they would be permitted to purchase in PPCL, Omni, and Placer would depend on the volume of business that they referred to the labs; and stated that partners who did not refer business would be pressured to leave the partnerships. Hitchcock also told potential investors that the partners' return on their investment would be virtually guaranteed. Hitchcock's representations to limited partners constitutes offers of payment to induce referrals of program-related business.

The ALJ found that Patricia Hitchcock, acting as an agent of the Hanlester Network and the joint venture laboratories, violated section 1128B(b)(2), and held the Hanlester Network, PPCL, Omni, and Placer liable for her acts on the theory of respondeat superior.[15]

In order to prove that appellants violated the anti-kickback statute, the government must also prove that appellants' conduct was knowing and willful. 42 U.S.C. § 1320a–7b.[16]

*The Scienter Requirement*

Appellants argue that under the rationale of *United States v. Dahlstrom,* 713 F.2d 1423, 1427 (9th Cir.1983), their conduct cannot be knowing and willful. In *Dahlstrom,* this court held that a defendant could not be found to have acted willfully where the interpretation of a statute was "highly debatable" as applied to defendant's conduct. *Id.* at 1428 (court held the legality of a tax shelter program advocated by defendants was completely unsettled by any clearly relevant precedent). This is not such a case.

---

**14.** The marketing strategy was to enlist physician investors who were in a position to refer substantial quantities of tests to joint venture labs.

**15.** In the 1991 Decision, the ALJ found that Hanlester and the joint venture labs permitted Ms. Hitchcock to engage in conduct within the scope of her agency relationship which violated § 1128B(b)(2). Because this liability was essentially vicarious, the ALJ decided not to impose

any exclusions on the individual plaintiffs. (ALJ Decision '91, at 297).

**16.** The legislative history demonstrates that Congress, by use of the phrase "knowingly and willfully" to describe the type of conduct prohibited under the anti-kickback laws, intended to shield from prosecution only those whose conduct "while improper, was inadvertent." H.R. No. 96–1167, 96th Cong., 2d Sess. 59 (1980)

However, the *Dahlstrom* court also held that "willful" requires proof of a specific intent to do something which the law forbids. The Supreme Court has defined "Willfully" as "a voluntary, intentional violation of a known legal duty". *United States v. Pomponio*, 429 U.S. 10, 12, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976) (per curiam). Most recently, the Supreme Court has ruled that to establish willfulness, the Government must prove that defendants knew their conduct was unlawful. *Ratzlaf v. United States*, —— U.S. ——, ——, 114 S.Ct. 655, 657, 126 L.Ed.2d 615 (1994). The Supreme Court in *Ratzlaf* interpreted the term "willfulness" in the context of § 5322 and its related code sections. The Court held that willfulness requires both knowledge of the reporting requirement, and specific intent to commit the crime [of structuring].[17]

 We construe "knowingly and willfully" in § 1128B(b)(2) of the anti-kickback statute as requiring appellants to (1) know that § 1128B prohibits offering or paying remuneration to induce referrals, and (2) engage in prohibited conduct with the specific intent to disobey the law.

*Liability of the Hanlester Network and Joint Venture Labs*

 Patricia Hitchcock's representations to limited partners exceeded the parameters of the private placement memorandum issued by the Hanlester Network. Her actions reflect both knowledge that her conduct was unlawful, and a specific intent to disobey the law. Her conduct was knowing and willful.

 Because Hitchcock was acting as an agent for Hanlester and the joint venture labs, these corporate entities may be held vicariously liable for her actions. *See Boise Dodge v. U.S.*, 406 F.2d 771 (9th Cir.1969) (a corporation through its agents may be convicted of a crime requiring knowledge and willfulness). Moreover, the fact that Hitch-

cock acted contrary to the corporations' stated policy does not absolve them of liability. *See, United States v. Beusch*, 596 F.2d 871 (9th Cir.1979) (Finding that a corporation may be liable for acts of its employees done contrary to express instructions and policies.) "Merely stating or publishing [ ] instructions and policies without diligently enforcing them is not enough to place the acts of an employee who violates them outside the scope of his employment." *Id.* at 878. The ALJ determined that Hanlester and the joint venture labs permitted Hitchcock to engage in conduct violative of § 1128B within the scope of her employment. Thus, the Secretary's finding that Respondents Hanlester, Placer, Omni and PPCL "knowingly and willfully" violated § 1128B(b)(2) through the conduct of their agent, Ms. Hitchcock, is supported by substantial evidence in the record.

 Vicarious liability, however, does not extend to the partners individually. *United States v. A & P Trucking Co.*, 358 U.S. 121, 126–27, 79 S.Ct. 203, 207–08, 3 L.Ed.2d 165 (1958).

 We find that Appellants Tasha, Welsh, Huntsinger, Keorle, and Lewand did not knowingly and willfully violate subsection (b)(2) of the anti-kickback statute.

There is no evidence that Lewand, Tasha, Welsh, Huntsinger or Keorle either directed or approved of the unauthorized representations made by Patricia Hitchcock in any way. In fact, Ms. Hitchcock's actions were contrary to their directions.[18]

The I.G. did not prove that any of the individual appellants conditioned the purchase of shares on an agreement to order tests; or that they conditioned the number of shares sold on the amount of business that the physicians agreed to refer; or authorized the ouster of partners who failed to refer business. Therefore, these appellants are not personally liable for the unlawful conduct

U.S.Code Cong. & Admin.News, (1980), 5526, 5572.

**17.** Ratzlaf was convicted of structuring financial transactions to avoid currency reporting requirements under the anti-structuring provisions of the Money Laundering Control Act of 1986, 31 U.S.C. § 5324. The Supreme Court held that to

establish that defendant willfully violated the anti-structuring law, the government must prove defendant acted with knowledge that his conduct was unlawful. *Id.* at ——, 114 S.Ct. at 657.

**18.** Appellants told physicians that under California law, it would be illegal to offer or pay consideration to a physician to induce or compensate that physician to refer patients to a laboratory.

of Hanlester, PPCL, Omni, and Placer, which resulted from Ms. Hitchcock's unlawful acts. To the extent that the Secretary now contends that appellants' conduct was unlawful, any illegality was not intentional.

We now consider whether appellants violated § 1128B(b)(1).

*Solicitation or Receipt of Remuneration in Return for Referrals*

■ Subsection (b)(1) prohibits the receipt of remuneration in return for referrals.[19]

The Secretary characterized the joint venture labs as "sham" operations which served as mere conduits for the payment of monies to physicians in return for the referral of tests from the labs to SKBL.[20]

■ The anti-kickback statute proscribes solicitation or receipt of remuneration directly or indirectly, overtly or covertly, in cash or in kind.

In *Bay State Ambulance*, 874 F.2d 20, the court held that "remuneration" encompasses both sums for which no actual service was performed, and sums for which some service was performed. *Id.* at 30.

The master laboratory services agreement between Hanlester and SKBL specified that PPCL, Omni, and Placer were required to provide facilities and equipment necessary for the operation of the clinical labs, and to repair and maintain lab space and pay utility charges. SKBL had a duty to staff, operate, and supervise the labs, and to conduct all billing and collection activities on their behalf. SKBL was to receive a fee of 76 percent of the laboratories' net revenues. The appellants received 24 percent of net revenues.

There is no question that appellants received substantial economic benefit from their relationship with SKBL. In addition to a net profit, appellants received benefits in the form of (1) SKBL's assumption of the operating risks and management responsibilities for the laboratories and appellants' corresponding relief from those duties, (2) SKBL's payment of anticipated receipts in advance, and (3) the use of SKBL's name and reputation as an enticement for enlisting potential limited partners.

■ The management services agreement between SKBL and appellants reflects a relatively common practice in the clinical laboratory field. There is no evidence that appellants intended to conceal payments from SKBL to physicians in return for referrals.

The Hanlester appellants believed their conduct to be lawful. The evidence shows that no payments were made to appellants, and that payments actually flowed from PPCL, Omni, and Placer to SKBL in the form of fees for its management services.

The I.G. did not prove that any of the appellants intentionally solicited or received remuneration from SKBL in return for referrals. Therefore, the Secretary's finding that appellants "knowingly and willfully" solicited and received remuneration in return for referrals is not supported by substantial evidence.

*Permissive Program Exclusions*

The Secretary's authority to impose a civil remedy against parties who violate § 1128B(b) derives from § 1128(b)(7), which applies to "any individual or entity" whom the Secretary determines has committed an act described in § 1128B.

■ The remedial purpose of § 1128(b) is to enable the Secretary to protect federally-funded health care programs and their beneficiaries and recipients from future conduct

19. The relevant text of section § 1128B(b)(1) states:
(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under [Medicare or Medicaid],
shall be guilty of a felony.

20. The Secretary determined that the Hanlester appellants solicited and received from SKBL substantial economic benefits in return for channelling a referral stream of tests to SKBL.

which is or might be harmful. Social Security Act, section 1128.

■ There is no evidence that Hanlester, PPCL, Omni, or Placer caused harm to the Medicare or Medicaid programs. Because liability is strictly vicarious, emanating totally from the conduct of Ms. Hitchcock, any untrustworthiness on the part of the Hanlester appellants which existed while Hitchcock represented them ceased to exist once Hitchcock left the employ of Hanlester. Exclusion of these appellants is therefore unnecessary to meet the remedial purposes of the Act.[21]

*Individual Appellants*

Since we find that Lewand, Tasha, Huntsinger, Keorle and Welsh did not violate either subsection of § 1128B, no remedial purpose would be served by excluding these appellants. Based on the foregoing, we AFFIRM the Secretary's conclusion that appellants Hanlester, Omni, Placer and PPCL violated subsection (b)(2) of § 1128B. We REVERSE the Secretary's conclusion that any of appellants violated subsection (b)(1) of § 1128B, and REVERSE the imposition of permissive exclusions on appellants.

---

21. This may be a moot point, since the joint venture labs are already out of business.