636 A.2d 219

**ELLWOOD CITY FORGE CORPORATION**

v.

**FORT WORTH HEAT TREATING COMPANY, INC., d/b/a Ellwood City Heat Treating and/or Advanced Metallurgical Technology, Inc., Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 8, 1993.

Filed Jan. 13, 1994.

242

John R. Seltzer, New Castle, for appellant.

Suzanne L. DeWalt, Pittsburgh, for appellee.

Before McEWEN, DEL SOLE and HESTER, JJ.

HESTER, Judge:

Fort Worth Heat Treating Co., Inc., formerly Ellwood City Heat Treating, and now Advanced Metallurgical Technology, Inc., appeals from the May 5, 1993 judgment entered by the Lawrence County Court of Common Pleas following a jury trial. The jury found appellant liable to Ellwood City Forge Corporation, appellee, in the amount of $162,500 plus prejudgment interest on a breach of contract claim. Appellant asserts

that the trial court erred in denying appellant's request for judgment notwithstanding the verdict, failing to adequately instruct the jury, and failing to mold the jury's verdict. We are constrained to reverse and remand.

The record viewed in the light most favorable to the verdict winner reveals the following. Appellee owned, what it believed to be, a 450 kilowatt ("K.W.") ionitride furnace (hereinafter "furnace"), which uses heat and electrical energy to ionize the surface of a section of metal. The furnace charges the metal, and a plasma with the opposite polarity is applied, thereby binding the plasma to the surface of the metal rendering it much stronger. This process is used to strengthen sections of machinery and also to attach dyes to metal used in manufacturing automobiles. Appellee utilized this relatively new technology as a subsidiary enterprise to its main steel fabricating business but soon discovered the furnace it had acquired was difficult to both operate and maintain, and that the business appellee anticipated obtaining did not materialize or profitably support full-time utilization of the furnace.

Appellee originally came into contact with appellant, headquartered in Fort Worth, Texas, as the result of appellant's reputation as an expert in operating and repairing ionitride furnaces. Appellee became interested in sub-contracting use of the furnace to appellant since the furnace was not being operated to capacity, and appellee was not realizing a profit from its use. Appellant responded favorably since it had obtained a contract with Chrysler Motor Corp. to ionitride automobile parts and Ellwood City was closer to the center of the automobile industry than Texas. On January 28, 1985, the parties negotiated a written sub-contract agreement (hereinafter the "agreement"), whereby appellant would maintain and operate the furnace (referred to in the agreement as "Equipment") subject to a number of conditions and terms.

The agreement provided that appellant would use the furnace but reserve at least thirty percent of furnace usage time for appellee during the weekdays, and appellant would provide personnel to operate and maintain the furnace on a twenty-four hour basis. Appellee provided one operator for the

weekdays when appellee operated the furnace. For use of the furnace, appellant promised to pay appellee $10,000 per month and thirty percent of the net profits for the five-year term of the agreement. Appellee was responsible under the agreement to provide utilities to power the furnace, including electricity and natural gas, and appellant was to pay for any utilities which exceeded the current utility costs incurred by appellee before net profits were calculated. The agreement included other terms such as insurance provisions and a provision indicating that the agreement was not to be construed as a joint venture or partnership.

The parties experienced difficulties almost from the beginning. Continuous problems were encountered in operating the furnace and in obtaining sufficient heat and electrical power. The furnace could ionitride pieces but not to the degree appellant desired or anticipated. The parties worked together to resolve the difficulties since each party desired that the other party succeed in the enterprise. Eventually, appellant discovered that the furnace transformers were rated at only 350 K.W., instead of 450 K.W. as set forth on the furnace identification plate. Moreover, the transformers were too old and too worn to provide sufficient power to perform the tasks required by appellant. The parties ultimately determined that the only method to correct the power problem would be to replace the 350 K.W. transformers with 450 K.W. transformers, which would cost approximately $60,000. However, neither party was willing to make this investment. Appellant also encountered fiscal problems and continuously was in arrears in making its rental payments. Appellant eventually abandoned use of the furnace and stopped paying as required in the agreement. Appellee maintained that this breach was due to appellant's financial difficulties. Appellee further claimed that the furnace was operable, and appellant had assumed responsibility for its operation. Ultimately, appellee filed suit for the balance due under the agreement for the entire term.

Appellant filed an answer and new matter. Appellant contended that the equipment described in the agreement, which

included the furnace with 450 K.W. transformers, was not the furnace appellee delivered. Appellant acknowledged that the agreement provided that it was responsible for operating and maintaining the furnace. However, appellant contended that it could not operate and maintain the furnace as required in order to achieve its goals due to the fact that the transformers were underpowered and were not as set forth on the identification nameplate. Appellee regarded the agreement merely as describing whatever the furnace was it purchased and installed in its plant. Appellant, however, concluded that supplying an incorrect and inadequate furnace was a material breach of the agreement by appellee which excused appellant from further payment or performance under the agreement.

Following a trial, the jury rejected appellant's arguments that the term "power" used in the agreement meant that appellee was responsible for any more than simply delivery of the power to the furnace as supplied by the utility companies. The jury found in favor of appellee for an amount slightly less than the full amount remaining due under the agreement. This appeal followed denial of post-trial motions and entry of judgment. We find merit in appellant's argument that the trial court improperly denied its request for jury instructions regarding frustration of purpose and commercial impracticability.

We first note that we will not reverse based upon a court's charge to the jury unless the charge as a whole was in error and prejudiced the complaining party. *Schecter v. Watkins*, 395 Pa.Super. 363, 577 A.2d 585 (1990). *See also Ott v. Buehler Lumber*, 373 Pa.Super. 515, 541 A.2d 1143 (1988). In this instance, appellant argues that the underpowered furnace delivered by appellee was not the one it bargained for, and the one supplied by appellee made it commercially impractical to continue to perform under the agreement. Appellant argues it was entitled to these instructions since they are supported by the evidence and the jury could have discharged it from the agreement under these principles.

Appellant, *inter alia,* requested the following instructions, which were denied by the trial court:

Defendant's request for jury instruction no. 4

Under the laws of the Commonwealth of Pennsylvania, after a contract is made a party's performance is made impracticable without its fault by the occurrence of an event, the non-occurrence of which is a basic assumption on which the contract was made, the party's duty to render that performance is discharged unless the language or circumstances indicate the contrary. Therefore, if you find that after the contract was made, the performance of the Agreement became impracticable without fault of the Defendant when the Ionitride furnace failed to operate to its stated capacity and that the performance of the furnace at its stated capacity was a basic assumption on which the contract was made, then you may find that the Defendant's duty to perform under the Agreement is discharged.

Defendant's request for jury instruction no. 6

Under the laws of the Commonwealth of Pennsylvania and the evidence in this case, you are instructed that where a contract relates to specific property, the existence or maintenance of which is necessary to the carrying out of the purpose of this Agreement, the condition implied by law, just as though it were written into the Agreement, that the impossibility of performance or the frustration of purpose arising from the destruction of the property or interference with its use, without the fault of either party, ends all contractual obligations relating to the property. Moreover, you are further instructed that impossibility in this connection means not only strict impossibility but impracticality because of extreme and unreasonable difficulty, expense, or loss involved.

■ Appellant contends that the questions presented in these instructions are subject to resolution by a jury. *See West Development Group v. Horizon Financial,* 405 Pa.Super. 190, 592 A.2d 72 (1991); *Typhoon Air Conditioning v. Fried,* 147 Pa.Super. 605, 24 A.2d 926 (1942) (question whether

breach should discharge the other party is a jury question). The non-existence of a condition or subject matter essential to the continuance of the agreement can lead to dissolving the agreement due to "frustration" of purpose. *See Greek Catholic Congregation v. Plummer,* 338 Pa. 373, 382, 12 A.2d 435, 439 (1940). Appellant asserts the jury could have found that the failure to deliver a 450 K.W. furnace as promised was an essential term that frustrated the intent of the parties and absolved it from its obligations under the agreement. It contends the court refused to give these instructions to the jury, incorrectly opting to instruct the jury instead on complete failure of consideration.

Appellant relies on *Olbum v. Old Home Manor,* 313 Pa.Super. 99, 459 A.2d 757 (1983), where we quoted with approval the Restatement of Contracts 2nd § 263, comment a:

*Rationale* This Section, like the preceding one, states a common specific instance for the application of the rule stated in § 261. If, as both parties understand, the existence of a specific thing is necessary for the performance of a duty, it is "a basic assumption on which the contract was made" that that will come into existence if it does not already exist and will remain in existence until the time of performance. Therefore, if its failure to come into existence or its destruction or deterioration makes performance impracticable, the obligor's duty to render that performance is discharged, subject to the qualifications stated in § 261. Each party bears some of the risk that the transaction will not be carried out for such a reason. *Id.* at 328.

313 Pa.Super at 108–109, 459 A.2d at 762 (emphasis omitted). In *Olbum,* the parties agreed to lease two coal seams. The coal proved to be unmineable and unmerchantable. We concluded that the Restatement of Contracts 2d § 261 applied, and each party assumed the risk that the coal was not useable in the absence of special language or circumstances of guaranteed performance. Appellant argues that in this instance, it bargained for a 450 K.W. furnace which it did not receive. Thus, it claims this principle is applicable since the wrong furnace likely is the act of a third party. It additionally

asserts that the language placing responsibility on appellant for operating and maintaining the furnace did not encompass the risk of lack of power from an incorrectly identified furnace.

■ Appellant finally maintains that the record supports an instruction on frustration of purpose. Witnesses testifying on behalf of appellant indicated that despite great efforts made by both parties over a long period of time, the parties were unable to make the furnace achieve the heat and power required to ionitride the metal pieces to appellant's satisfaction. Only much later did the parties discover that the transformers were underpowered. Accordingly, appellant argues the jury should have been instructed to decide if the failure to deliver a 450 K.W. furnace should absolve appellant from performing further under the agreement. We agree.

■ Appellant additionally asserts the evidence supported giving the instruction it requested on commercial impracticability of performance. Both parties agree that the only way to achieve the required heat and power is by replacing the 350 K.W. transformers with 450 K.W. transformers at a substantial cost. Appellant argues that it was a matter for the factfinder to determine whether appellee's failure to provide a 450 K.W. furnace as promised entailed such substantial, unanticipated costs that it constitutes a breach which made further performance by it commercially impracticable in light of the risks it assumed and the benefits available under the agreement.

Appellant relies on *West v. Peoples First Nat'l Bank & Trust*, 378 Pa. 275, 106 A.2d 427 (1954), in which land was to be developed by a joint venture, but a substantial portion of the project was condemned for a highway. The issue concerned whether the agreement was terminated by the condemnation. In *West*, our Supreme Court held that where a contract relates to a specific property in existence, the maintenance of which is essential to the carrying out the purpose of the agreement, the condition of its continued existence is implied in the agreement by law, just as though it were

written in the agreement. The question then was whether the impossibility of performance or frustration of purpose, without fault of either party, arising from the destruction of the property or its use, ends all contractual obligations. Our Supreme Court noted the Restatement of Contracts § 454 also applies the test of impracticability rather than strict impossibility, stating: "[I]mpossibility in that connection means not only strict impossibility but *impracticability* because of extreme and unreasonable difficulty, expense, or loss involved." *Id.*, 378 Pa. at 282, 106 A.2d at 432. (emphasis in original). At that point, it is up to the parties to waive the difficulties or seek to terminate the agreement. *Id.* Appellant contends that it abandoned the agreement once it was discovered the furnace only was 350 K.W. and would involve substantial money to upgrade it. Appellant therefore argues that the jury should have been instructed that the production of the incorrect furnace entitled appellant to discharge due to commercial impracticability. We agree.

We reject appellee's contention that appellant's request for such an instruction was satisfied when the court gave an instruction regarding complete failure of consideration on the basis that the furnace entirely was unsuited to its task. The court instructed the jury:

> Now, Fort Worth defends the cause of action by Ellwood Forge by claiming that Forth Worth is not liable under the agreement because Ellwood Forge breached the contract or the agreement, by one, failing to supply a proper power source or supply, that is, an adequate transformer, a 450 K.W. transformer; b, by failing to provide an operator for the equipment and office space; and by failing to install a water cooling system by the recirculation of water; and in addition, Fort Worth contends that it stopped making payments and left Ellwood Forge's plant after Ellwood—after it had paid Ellwood City Forge up to the time that they were forced to leave.

Notes of Testimony, 9/25/91, at 5–6.

Instantly, the furnace could ionitride but lacked the output capacity of a 450 K.W. furnace. The fact that the furnace was

only a 350 K.W. furnace, however, was not known to appellee at the time the agreement was executed. Thus, appellee believed it delivered what to its knowledge was the furnace described and promised in the agreement, and there was not a failure of essential consideration on its part. We conclude that the total failure of consideration instruction given by the trial court incorrectly may have led the jury to conclude that the furnace substantially must be inoperable for most uses intended by appellant before appellant could be discharged, which is a broader and stricter requirement than practical impossibility or frustration of an essential term or purpose. The jury also may have found that appellee delivered the correct furnace to the best of its knowledge, which does not address the real problem of frustration of purpose or commercial impracticability.

We also reject the argument by appellee that utilization of a manufacturer's defect caused by a third party is restricted solely to personal injury and consumer cases and may not be used to discharge performance or seek recovery for economic losses in a commercial contract. *See generally REM Coal Co. v. Clark Equipment*, 386 Pa.Super. 401, 563 A.2d 128 (1989) (concepts of manufacturer's defect is limited to tort cases, and breach of warranty of merchantability and fitness for a particular purpose is intended to apply only to consumer cases and not to commercial cases). This case is distinguishable since appellant is not alleging a manufacturer's design defect,[1] but seeks discharge based on recognized contractual principles.

Consequently, we hold the trial court's instructions as a whole were insufficient, and the court erred in refusing to instruct the jury regarding impossible practical performance of the contract and frustration of an essential term. Since this refusal may have affected the outcome of the jury's verdict and prejudiced appellant, we are constrained to grant appellant a new trial. *See Schecter v. Watkins, supra; Ott v.*

1. We note that appellee's remedy may lie in a suit against the manufacturer. The record indicates that appellee already has sold the furnace and instituted such a suit.

*Buehler Lumber, supra.* (where court incorrectly instructs the jury and this may have prejudiced the losing party, a new trial is required).

Judgment reversed and remanded. Jurisdiction relinquished.