**ALPHA REAL ESTATE COMPANY OF ROCHESTER, Appellant,**

v.

**DELTA DENTAL PLAN OF MINNESOTA, et al., Respondents.**

No. C7–01–2259.

Court of Appeals of Minnesota.

Nov. 18, 2003.

Review Denied Jan. 20, 2004.

Timothy J. Hassett, Janet A. Newberg, Felhaber, Larson, Fenlon & Vogt, P.A., St. Paul, MN, for appellant.

David B. Morse, Eagan, MN, for respondents.

Considered and decided by KALITOWSKI, Presiding Judge, LANSING, Judge, and G. BARRY ANDERSON, Judge.

## OPINION

### G. BARRY ANDERSON, Judge.

Appellant Alpha Real Estate Company ("Alpha") sued respondents Delta Dental Plan of Minnesota ("Delta") and Sui Generis Development Company ("Sui Generis"), a wholly owned subsidiary of Delta, to enforce the exercise of Alpha's option to purchase a dental clinic pursuant to Alpha's lease with Sui Generis; Sui Generis and Delta counterclaimed for breach of contract. After a trial, the district court concluded that Alpha had breached the parties' contract by failing to pay a five-percent rental surcharge and that the disputed provision was not illegal under federal or state law. Alpha appealed, and this court affirmed. *Alpha Real Estate of Rochester v. Delta Dental Plan of Minn.,* C7–01–2259, 2002 WL 1840897 (Minn.App. Aug. 13, 2002), *aff'd in part, rev'd in part,* *and remanded,* 664 N.W.2d 303 (Minn. 2003). The supreme court affirmed in part and reversed in part and remanded to this court to conduct a de novo review as to whether the five-percent rental surcharge violated state and federal law. *Alpha Real Estate of Rochester v. Delta Dental Plan of Minn.,* 664 N.W.2d 303 (Minn.2003). We affirm in part, reverse in part, and remand for determination of attorney fees.

## FACTS

This case arises from the establishment of a dental clinic in Rochester, Minnesota. Delta Dental Plan of Minnesota is a non-profit health-service-plan corporation that sells and administers dental benefits to group plans, governmental units, and labor unions on a contract basis. In 1995, Delta was experiencing difficulties finding service providers in the Rochester area. Delta contacted Dr. Ted Erickson, a Faribault dentist, and negotiated a contract under which Delta would purchase and construct a dental clinic in Rochester and Erickson would provide the services under a provider agreement. Both parties sought to keep the arrangement confidential.

To implement this plan, Delta formed a wholly owned subsidiary, Sui Generis Development Company, to purchase, construct, and equip the property and to act as landlord. Erickson formed two companies, Alpha Real Estate of Rochester ("Alpha"), which leased the property from Sui Generis, and Apollo Dental Center, PLC ("Apollo"), which leased the property from Alpha. Apollo also entered into a provider agreement with Delta and operated the dental clinic. Apollo is not a party to this appeal.

In 1995, the parties entered into lengthy negotiations concerning the dental clinic. A document known as the 1995 agreement contained the following provision, "If in any one calendar year during the first ten

years of the Lease (1996–2005) the adjusted cash receipts exceed $1 million, [Alpha] shall pay to Sui Generis additional rent for that particular year a sum equal to five percent of adjusted cash receipts." The 1995 agreement also provides that Erickson may purchase the clinic, but, in that event, "the additional five percent rental formula based upon adjusted cash receipts shall continue for the remainder of the ten year period." The 1995 lease, a separate document, also contains the five-percent rental surcharge clause, but it does not provide that it continues after the sale of the clinic. The 1995 lease was replaced by the 1997 lease, which was drafted to reflect the fact that construction of the building had been completed; it contains the five-percent rental surcharge clause that was in the 1995 lease.

The benchmark amount of $1 million was attained in 1998 and in 1999, but Alpha did not pay the additional sums due under the five-percent clause in 1998 or 1999. Delta served notices of default but took no steps to evict Alpha, which otherwise continued to pay its rent.

In 1999, Alpha attempted to exercise its option to purchase the property, but Delta refused to convey the property unless Alpha agreed to pay the five-percent charge on a continuing basis after the sale pursuant to the 1995 agreement. Alpha sued for specific performance. Delta counterclaimed for breach of contract based on Alpha's failure to make payments in 1998 and 1999 under the five-percent clause, and a court trial was held.

The district court, finding the lease ambiguous and considering extrinsic evidence, held that the five-percent clause survived Apollo's exercise of the option to purchase the clinic and this court affirmed. *Alpha Real Estate of Rochester v. Delta Dental Plan of Minn.*, C7-01-2259, 2002 WL 1840897 (Minn.App. Aug. 13, 2002), *aff'd in part, rev'd in part, and remanded*, 664 N.W.2d 303 (Minn.2003). The supreme court affirmed in part and reversed in part, holding in relevant part that the 1997 lease was a "complete integration" and "that under the 1997 lease Alpha's five percent additional rent obligation terminates upon the closing of the option to purchase." *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 314 (Minn.2003). Under the supreme court's decision, however, because the $1 million benchmark was achieved in 1998 while the 1997 lease was in effect and "because the district court ordered Alpha to pay Delta $165,500.81 in additional rent for 1998 and 1999," the challenge to the legality of the five-percent clause remained. *Id.* Because this court applied an incorrect standard of review in considering the issue, the supreme court remanded to this court for de novo review the issue of "whether the five percent additional rent clause violates federal and state law." *Id.* at 314–315. This court then reinstated the appeal.

## ISSUES

I. Does the five-percent clause violate the federal anti-kickback statute, 42 U.S.C. § 1320a–7b(b) (Supp. V 1999), or the state law prohibiting conflicts of interest by health-care providers, Minn.Stat. § 62J.23 (2002)?

II. Does the five-percent clause violate the state prohibition against fee splitting by dentists under Minn.Stat. § 150A.11, subd. 4 (2002)?

III. If the five-percent clause is illegal, is it severable from the remainder of the 1997 contract?

## ANALYSIS

Alpha took this appeal from the district courts decision, after a court trial,

without making a motion for a new trial. As enunciated by the supreme court, "while permissive, motions for a new trial pursuant to Minn. R. Civ. P. 59.01 are not a prerequisite for appellate review of substantive questions of law when a genuine issue of law is properly raised and considered at the district court level." *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 311 (Minn.2003). An appellate court does "not give deference to the district court's conclusions of law and we review questions of law de novo." *Id.*

I.

The supreme court remanded to this court the issue of "whether the five percent additional rent clause violates federal and state law." *Id.* at 315. Alpha contends that the five-percent clause is illegal because it violates the federal anti-kickback statute, 42 U.S.C. § 1320(a)–7b(b) (Supp. V 1999), and the state law prohibiting conflicts of interest by health-care providers, Minn.Stat. § 62J.23 (2002). As an initial matter, we note that under Minn. Stat. § 62J.23, subd. 2, the federal anti-kickback statutes and related federal regulations apply to the state statute until the Commissioner of Health adopts rules concerning the section. Because such state rules have not yet been adopted, we apply federal law, and a separate analysis of state law is unnecessary.

■ "A contract violating law or public policy is void." *Barna, Guzy & Steffen, Ltd. v. Beens*, 541 N.W.2d 354, 356 (Minn. App.1995), *review denied* (Minn. Feb. 27, 1996). A contract may be deemed illegal if it violates the federal anti-kickback statute. *See Feldstein v. Nash Cmty. Health Servs., Inc.*, 51 F.Supp.2d 673, 680 (E.D.N.C.1999) (addressing this issue). Under the federal anti-kickback statute, it is a felony to *"knowingly and willfully*

solicit[ ] or receive[ ] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind" in return for referrals or purchases, leases, or orders of any goods or services under federal health-care programs. 42 U.S.C. § 1320a–7b(b)(1) (emphasis added).

■ We focus here on the intent requirement. "Because the anti-kickback statute is a criminal statute with a scienter requirement," there must be a finding that the requisite intent is present before it can be determined that the contract violates the federal anti-kickback law. *Feldstein*, 51 F.Supp.2d at 684. Courts have construed the intent requirement somewhat differently. The eighth circuit court of appeals explained it as follows: "Both the plain language of [the anti-kickback] statute, and respect for the traditional principle that ignorance of the law is no defense, suggests that a heightened *mens rea* standard should only require proof that [the defendant] knew that his conduct was wrongful, rather than proof that he knew it violated 'a known legal duty.' " *United States v. Jain*, 93 F.3d 436, 441 (8th Cir. 1996); *see United States v. Starks*, 157 F.3d 833, 838 (11th Cir.1998) (applying similar standard). *Starks* noted that the anti-kickback statute was not highly technical and did not pose a danger "of ensnaring persons engaged in apparently innocent conduct. Indeed, the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal." 157 F.3d at 838. In contrast, the ninth circuit required that the defendant have knowledge of the anti-kickback statute and engage in prohibited conduct with specific intent to disobey the law. *Hanlester Network v. Shalala*, 51 F.3d 1390, 1399–1400 (9th Cir.1995). In any event, under either test, there must be

proof that the defendant knew his conduct was wrongful.

In addressing the intent issue here, the district court first found that Alpha's reliance on *Starks* was misplaced because there the defendants were found liable for violating the statute based on behavior that was in no way analogous to the behavior exhibited by the defendants in this case. In *Starks*, the defendants, conscious that their behavior violated the law, accepted kickback payments in parking lots or restaurants and threatened to take women's babies away if they did not participate in the program from which the defendants were receiving money for their referrals. 157 F.3d at 836–37. The district court also distinguished *Jain*, in which the defendant was convicted for behavior the jury believed to be egregious, which included payments to the defendant of $1,000, allegedly for marketing, but which were in fact payments for referrals. 93 F.3d at 438. In contrast, the district court in this case concluded there was no intent to violate the anti-kickback law, finding "[t]hat neither Delta, Sui Generis, Erickson nor Alpha had any intent to violate the Federal Law or the State Law with respect to the August 1995 Agreement or the Lease. None of the parties involved thought that they were violating the law."

In challenging this decision, Alpha argues that the five-percent clause was solicited with illegal intent because the evidence at trial demonstrated that the parties knew their conduct was wrong within the meaning of *Jain*. Alpha also contends that Delta tried to create various post hoc rationales for the purpose of the payment and asserts that Delta acted as a landlord through, essentially, a sham corporation, Sui Generis, that had no real business purpose. Alpha argues these "have the hallmarks of a cor-

rupt motive or 'bad purpose' that fall directly within the definition of knowing and willful conduct under *Jain*."

The district court heard extensive trial testimony and rejected the claim that Delta and Sui Generis acted with bad intent. The district court's findings are not clearly erroneous. Applying the facts as found by the district court, the contract does not violate the anti-kickback statute as a matter of law. The district court's determination is affirmed.

## II.

We next address whether the five-percent clause violated the anti-fee-splitting law for dentists, Minn.Stat. § 150A.11, subd. 4 (2002). The district court ruled that it did not, reasoning that a violation requires a referral with an intent to defraud and that Delta did not have that intent.

The anti-fee-splitting statute provides:

It shall be unlawful for any dentist to divide fees with or promise to pay a part of the dentist's fee to, or to pay a commission to, any dentist or other person who calls the dentist in consultation or who sends patients to the dentist for treatment or operation, but nothing herein shall prevent licensed dentists from forming a bona fide partnership for the practice of dentistry, nor to the actual employment by a licensed dentist of a licensed dental hygienist or another licensed dentist.

Minn.Stat. § 150A.11, subd. 4. The corresponding rule states: "A person shall not directly or indirectly offer, give, receive, or agree to receive any fee or other consideration to or from a third party for referral of a patient in connection with the performance of professional services." Minn. R. 3100.6900 (2001).

■ Generally, referral fees are deemed against public policy and unenforceable, and "fee-splitting agreements often require a division of labor or responsibility to be consistent with public policy." *Christensen v. Eggen*, 577 N.W.2d 221, 225 (Minn.1998) (holding that fee-splitting agreement between attorneys does not comply with rules of professional conduct and is unenforceable without a division of labor or responsibility); *see Reyburn v. Minn. State Bd. of Optometry*, 247 Minn. 520, 524–25, 78 N.W.2d 351, 355 (1956) (discussing meaning of unprofessional conduct generally).

■ Analysis of whether a contract constitutes illegal fee splitting "depends upon a conclusion with respect to the nature of the conduct the legislature intended to proscribe." *Wyoming State Bd. of Examiners of Optometry v. Pearle Vision Ctr., Inc.*, 767 P.2d 969, 973 (Wyo.1989). In splitting fees,

> [t]here is a danger that a doctor, knowing that he had to split his fees with one who did not render medical services, might be hesitant to provide proper services to a patient. Conversely, unneeded treatment might be rendered just because of the need to split fees. In either case, the interests of the patient would be compromised.

*E & B Mktg. Enters., Inc. v. Ryan*, 209 Ill.App.3d 626, 154 Ill.Dec. 339, 568 N.E.2d 339, 342 (1991).

■ The first issue we address is whether, as the district court determined, the anti-fee-splitting statute requires intent to defraud as the federal anti-kickback statute does. As discussed earlier, the federal statute explicitly contains an intent provision, applying to "whoever knowingly and willfully solicits or receives any remuneration" for referrals. 42 U.S.C. § 1320a–7b(b)(1). In contrast, the anti-fee-splitting statute contains no such

language. Minn.Stat. § 150A.11, subd. 4. Consequently, specific intent to defraud is not required.

The next issue is whether the five-percent clause violated the prohibition against dividing fees with one "who sends patients to the dentist." Minn.Stat. § 150A.11, subd. 4. Delta argues that the five-percent clause was not a referral tied to patients and there was no evidence that it sent patients to the dentist for treatment. Alpha contends that because it was required to pay Delta a percentage of revenues in exchange for patient referral services—Delta's marketing efforts—the clause violates the prohibition against fee splitting.

To resolve this, we first review the facts as found by the district court. As we noted in our earlier opinion, the findings on this point are somewhat contradictory. *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, No. C7–01–2259, 2002 WL 1840897, *9 (Minn.App. Aug. 13, 2002). First, the district court found no evidence showing "that either Delta or Sui Generis ever referred any specific patients to the clinic." It also found that "Alpha has not shown the referral by Delta or Sui Generis of any patients to the clinic who were covered under" a federal health-care program. Nonetheless, the district court found that "Delta receives 5% of all revenue, not just 5% of the revenue received on the basis of patients 'referred' to Alpha by Delta." The district court also found, based on the 1995 agreement, that the purpose of the five-percent clause was "as reimbursement for the risk assumed by Delta under this agreement and also as a partial contribution to defraying Delta's cost of marketing products in the Rochester area so as to provide a satisfactory volume of patients" for the clinic. To this end, the district court found Delta was marketing its products on behalf of the clinic by "(1) offering to send a marketing

letter to IBM employees, (2) transferring patients from two other dental practices, (3) including the Dental Clinic in the IBM marketing fair, and (4) contacting the Mayo Clinic to attempt to have the dental clinic provide general dentistry services for Mayo employees." The district court, however, characterized the five-percent clause as simply "a return on its investment in building and equipping the dental facility." We therefore must determine whether these marketing efforts in exchange for a percentage of revenue from patients constitutes illegal fee splitting.

Other jurisdictions are divided on the issue of fee splitting. One court rejected a claim of illegal fee splitting, concluding that the record established that an optometrist did not pay the corporation to send or direct patients to him; instead, it was for the privilege of operating the franchise. *Wyoming State Bd.*, 767 P.2d at 974. The court stated that "[t]he fact that the consideration for that privilege is based in part upon a percentage of the proceeds derived from furnishing optometric services does not make it an agreement for 'splitting or dividing a fee' any more than would a consideration for the sublease which was based in part upon a percentage of the optometrist's income." *Id.* The court distinguished cases in which the facts were "sufficiently close to providing or referring patients." *Id.* at 973 n. 1. The court also rejected a claim that referrals occurred because the franchise's advertising specifically encouraged or directed patients to go to the optometrist where the ads, for the most part, directed consumers to the franchise rather than the individual optometrist. *Id.* at 974.

Other courts have deemed marketing-related fee-splitting arrangements illegal. In one such case, a doctor contracted to have a marketing firm promote his practice to insurance companies, and, in exchange, the marketing firm was to receive a consultant's fee of ten percent of the insurance billings arising from those referrals. *E & B Mktg.*, 154 Ill.Dec. 339, 568 N.E.2d at 340. The marketing firm alleged breach of contract when the doctor refused to make some of the payments. The doctor argued the provision was illegal. *Id.* at 339, 568 N.E.2d at 341. The court ultimately found the contract void as constituting illegal fee splitting in violation of the statute regulating physicians. *Id.* at 339, 568 N.E.2d at 342. The court rejected the claim that there was no violation because there was no direct solicitation of patients where the funds were received from the insurance company. *Id.* at 339, 568 N.E.2d at 341. The court held that the precise source of the payment was not at issue when the act prohibited "receipt of any fee or commission, direct or indirect, for professional services not actually rendered" and that receipt of such money indirectly violated the law. *Id.; see also Sachs v. Saloshin*, 138 A.D.2d 586, 526 N.Y.S.2d 168, 169 (1988) (holding that arrangement violated prohibition against fee splitting where dentist paid 20% of his gross revenues from dentistry practice in partial payment for occupancy and use of dental facility under long-term lease).

Finally, in a recent Florida case, the court ruled that a service agreement between a doctor and a medical management company that provided for an annual fee based on a percentage of revenues and billings was illegal because it provided for fee splitting. *Gold, Vann & White, P.A. v. Friedenstab*, 831 So.2d 692, 694 (Fla.Dist. Ct.App.2002). Although the court found no evidence that the public relations and marketing duties resulted in increased business for the company, "the agreement, itself, impermissibly provided for payment of a percentage of the revenue the management services and practice enhancement would generate and, thus, constituted

an indirect method of fees for patient referral in violation [of state statutes]." *Id.*

█ While, as in *Wyoming State Bd.*, 767 P.2d at 973, we do not believe that every form of rent calculation involving a percentage of receipts is, as a matter of law, a violation of the anti-fee-splitting law, the agreement in this case crosses the line. The payments here are directly based on the amount of receipts from patients. *See Friedenstab*, 831 So.2d at 694. Even though there was no direct evidence of referrals, the marketing efforts by Delta constitute an effort to increase the number of patients seen at the clinic. *Id.* The statute broadly prohibits dentists from dividing fees with those who send patients to a dentist for treatment. Minn.Stat. § 150A.11, subd. 4. This includes payment of fees that are direct or indirect. Minn. R. 3100.6900.

Delta seeks to avoid this conclusion by arguing that neither Alpha nor Apollo, the corporation that has the provider agreement, is a dentist to whom the statute applies. *See* Minn.Stat. § 150A.11, subd. 4 (prohibiting dentist from dividing fees). This argument has no merit because the prohibition also applies to "indirect" payment or receipt of fees. Minn. R. 3100.6900. Erickson signed the leases as chief manager of Alpha, and there is no dispute that a dentist is the ultimate source of the fees that are divided.[1] Consequently, the five-percent clause is unenforceable.

### III.

The final issue to be considered is whether, because the five-percent clause is deemed illegal, the entire contract or just the offending clause should be voided. Although the district court found that the

five-percent clause was not illegal, it ruled that if the clause "were found to be illegal and not enforceable, because it is an integral part of the contract, removing that key term would affect the entire contract."

█ "[T]he intent of the parties must be ascertained in determining whether contract provisions are severable." *Guercio v. Prod. Automation Corp.*, 664 N.W.2d 379, 385 (Minn.App.2003). When the intent of the parties can be determined from the writing of the contract, "the construction of the instrument is a question of law for the court to resolve," and this court need not defer to the district court's findings. *Empire State Bank v. Devereaux*, 402 N.W.2d 584, 587 (Minn.App.1987). If, however, the language of the contract is ambiguous, extrinsic evidence may be considered. *Id.* If disputed extrinsic evidence is considered, the district court determination will not be reversed unless clearly erroneous. *Id.*

█ In assessing the parties' intent, we first examine the language of the lease. In paragraph 20.11 of the 1997 agreement, the parties agreed to a severability clause:

If any covenant, condition, provision, term or agreement of this Lease Agreement shall, to any extent, be held invalid or unenforceable, the remaining covenants, conditions, provisions, terms and agreements of this Lease Agreement shall not be affected thereby but each covenant, condition, provision, term or agreement of this Lease Agreement shall be valid and in force to the fullest extent permitted by law. This Lease Agreement shall be construed and be enforceable in accordance with the laws of the State of Minnesota.

In light of this clear and explicit agreement by the parties in the lease as to the

1. We decline to consider an argument made by Delta that was not decided by the district court.

severability of unenforceable clauses, we reverse the district court and hold that the five-percent clause is severable.

Finally, the issue of Alpha's motion for attorney fees must be addressed. Alpha made a motion for attorney fees, including $37,175.50 for its appeal to this court and $56,978 for its appeal to the supreme court. The supreme court remanded the issue of attorney fees to the district court pursuant to Minn. R. Civ.App. P. 139.06, subd. 2, for adjudication after a final decision on the merits. Likewise, we remand the issue of attorney fees for Alpha's appeal to this court to the district court for adjudication.

## DECISION

We hold that the five-percent clause does not violate the federal and state anti-kickback laws. But we nonetheless conclude that the clause is unenforceable because it violates the state law prohibiting dentists from dividing fees with a third party who sends patients to a dentist, and we hold that the clause is severable from the remainder of the lease. We remand for determination of attorney fees.

**Affirmed in part, reversed in part, and remanded.**