**CORNERSTONE GROUP XXII, L.L.C., Plaintiff–Appellant and Cross–Appellee,**

v.

**WHEAT RIDGE URBAN RENEWAL AUTHORITY, Defendant–Appellee and Cross–Appellant.**

No. 05CA0279.

Colorado Court of Appeals, Div. V.

Aug. 10, 2006.

§ 24–51–1105, C.R.S.2005.

Hale Friesen, LLP, Allan L. Hale, John G. Lubitz, Robert T. Hoban, Thomas D. Leland, Denver, Colorado, for Plaintiff–Appellant and Cross–Appellee.

Light, Harrington & Dawes, P.C., Steven J. Dawes, Denver, Colorado; Hayes, Phillips, Hoffmann & Carberry, P.C., Corey Y. Hoffmann, Denver, Colorado, for Defendant–Appellee and Cross–Appellant.

Opinion by Judge WEBB.

In this breach of contract action concerning condemnation and development of private property, plaintiff, Cornerstone Group XXII, L.L.C., appeals the trial court's judgment dismissing its specific performance claim against defendant, Wheat Ridge Urban Renewal Authority (the Authority). The Authority cross-appeals the trial court's preliminary injunction requiring it to preserve certain assets to satisfy a potential damage award in favor of Cornerstone. We affirm the preliminary injunction, reverse the dismissal, and remand for further proceedings.

### I. Factual Background

In June 2001, after determining that the southwest corner of 38th and Sheridan (the property) was "blighted" and thus subject to redevelopment, the Authority contacted Cornerstone, a commercial developer whose primary client was Walgreens, about building a Walgreens drugstore on the property. Cornerstone submitted to the Authority an initial, and later a formal, proposal to acquire the property and build the drugstore. Cornerstone also provided the Authority with Walgreens' written commitment to the project.

In May 2003, Cornerstone and the Authority entered into a Disposition and Development Agreement (DDA). Under the terms of this agreement, the Authority was to acquire through purchase or, if necessary, condemnation proceedings, title to five parcels that made up the property, and then sell these parcels to Cornerstone for $1.4 million; before closing, Cornerstone was to provide the Authority with evidence of an irrevocable commitment from Walgreens to operate the drugstore under a twenty-five-year lease; and after closing, Cornerstone was to develop the property by building the drugstore.

In the fall of 2003, after the Authority was unable to secure land acquisition financing, it entered into a Loan Agreement (LA) with Cornerstone. Under the LA, the Authority pledged $1,025,000 of its own funds ($800,000 of which would be raised in taxes over a four-year period), while Cornerstone committed to provide a $1.9–2.2 million line of credit for the Authority's use in acquiring the five parcels that made up the property, again through purchase or condemnation proceedings.

Both the DDA and the LA provided specific performance as a remedy for breach.

Using its own funds, the Authority purchased one of the five parcels (the Ames parcel). In June 2004, the Authority filed petitions in condemnation on the remaining four parcels.

A dispute arose after the Authority advised Cornerstone that it needed funding under the LA for the condemnation proceedings. Cornerstone was reluctant to disburse any funds without a deed to or security in the parcels being condemned. But the Authority did not submit a request for funding under

the LA. Instead, it terminated the DDA in late September 2004, abandoned the condemnation proceedings, indicated it was going to sell the Ames parcel, and began settling with the owners of the remaining four parcels, using funds it had pledged under the LA.

In November 2004, Cornerstone filed this action seeking, as relevant here, injunctive relief, specific performance, and damages based on breach of contract, equitable estoppel, and promissory estoppel.

## II. Preliminary Injunction Proceeding

Cornerstone moved for a preliminary injunction. At the hearing, the Authority asserted that it had terminated the DDA and the LA when Cornerstone defaulted on its obligations by neither confirming the availability of financing for the Authority's use in the condemnation proceedings to acquire immediate possession of the four parcels nor providing evidence of an irrevocable commitment to the project from Walgreens. However, the trial court described these two grounds as most likely mere excuses to avoid the Authority's obligations to Cornerstone because, for whatever reason, the Authority had "changed its mind about wanting a Walgreens store or perhaps anything else at the site."

With respect to the Authority's first assertion, the court found that the Authority had never invoked the process for obtaining funds under the LA; that the Authority likely could have acquired two of the remaining four parcels by agreement and without the necessity of any money being put up front; that Cornerstone was not, in any event, in need of immediate possession of the property; that Cornerstone had the financial ability and the desire to proceed with the project; and that, if "the Authority had truly wished to go forward with the project . . . it would have been easy for these two parties to get it done."

With respect to the Authority's second assertion, the court found that "Walgreens was committed to the project, and that there was no legitimate reason for the Authority to doubt it." The Authority had accepted the initial written commitment from Walgreens, and when the Authority first indicated that this was a problem, Cornerstone responded by providing the Authority with the first and last pages of a seventy-five-year lease signed by Walgreens. Thus, the court found it "more likely that the Authority . . . settled upon this issue as an event of default after it had decided for other reasons to pull the plug on the deal."

The court discerned a reasonable probability that Cornerstone would succeed on the merits of its breach of contract claim. The court noted, however, that to complete the project Walgreens needed all five parcels and that, most likely, two of those parcels could be obtained only through condemnation proceedings. Observing that "there is simply no authority supporting the notion that a court can order [the Authority] to resume condemnation cases and complete a project of this nature," the court concluded that it could not order specific performance.

The court preliminarily enjoined the Authority from failing to collect the funds it was required to raise under the LA, from disbursing any of those funds, and from selling at less than market value (and disbursing the funds from the sale of) the Ames parcel.

The court certified its ruling that Cornerstone could not obtain specific performance under the agreements as a final judgment appropriate for appeal under C.R.C.P. 54(b). Cornerstone appeals that ruling. The Authority cross-appeals the preliminary injunction under C.A.R. 1(a)(3).

## III. Specific Performance

Cornerstone contends the trial court made two errors in determining that specific performance was not an available remedy for the Authority's alleged breach of the DDA and LA: first, the court concluded, as a matter of law, that the Authority could not be required to condemn the parcels needed for the Walgreens project; and second, in any event, the court entered final judgment on the specific performance remedy without allowing Cornerstone the opportunity to discover evidence showing that the Authority might be able to acquire the parcels without using its condemnation power. Because we

agree with Cornerstone's first contention, we need not address its second contention.

■ Specific performance is an equitable remedy, *Clark v. Scena,* 83 P.3d 1191 (Colo.App.2003), not a matter of right. *Emery v. Medal Bldg. Corp.,* 164 Colo. 515, 436 P.2d 661 (1968). Whether it should be granted ordinarily depends on the equities of the case. *Schreck v. T & C Sanderson Farms, Inc.,* 37 P.3d 510 (Colo.App.2001).

But here, the trial court determined that contract provisions requiring the Authority to exercise its eminent domain power are unenforceable. Because this is a legal conclusion, we review it de novo. *See Turnbaugh v. Chapman,* 68 P.3d 570 (Colo.App. 2003).

### A. Statutory Delegation of the Power to Condemn

■ We reject Cornerstone's assertion that the contract provisions at issue are enforceable because they are expressly authorized under Colorado's Urban Renewal Law (URL), §§ 31–25–101 to 31–25–115, C.R.S. 2005.

Cornerstone relies on three provisions: (1) § 31–25–105(1)(b), C.R.S.2005, which authorizes an urban renewal authority "to make and execute any and all contracts and other instruments which it may deem necessary or convenient to the exercise of its [urban renewal] powers under this part 1"; (2) § 31–25–105(1)(e), C.R.S.2005, which authorizes such an authority "to acquire any property by purchase, lease, option, gift, grant, bequest, devise, or otherwise to acquire any interest in property by condemnation ... in the manner provided by the laws of this state for the exercise of the power of eminent domain by any other public body"; and (3) § 31–25–105.5, C.R.S.2005, which recognizes that property may be acquired through eminent domain proceedings for subsequent transfer to and redevelopment by a private party.

Contrary to Cornerstone's assertion, we perceive in these provisions no clear indication of an urban renewal authority's power to place in the hands of a private party the decision to condemn. The URL mentions many conventional matters that urban renewal authorities could effectuate only through contracts with private parties. But no provision suggests that urban renewal authorities may, through contract, delegate to private parties the governmental prerogative of taking property by eminent domain.

Neither § 31–25–105.5 nor § 31–25–105(1)(e) suggests this. The text makes clear that the overriding purpose of § 31–25–105.5 is to restrict eminent domain when used to acquire private property for transfer to another private party. And § 31–25–105(1)(e) speaks to exercising the eminent domain power "in the manner provided by the laws of this state," none of which authorizes the delegation of that power by contract to private entities. *See* §§ 38–1–101 to 38–7–107, C.R.S.2005.

■ Moreover, "[g]rants of power to exercise the sovereign right of eminent domain, in derogation of the common private rights of individuals, are generally strictly construed." 11 Eugene McQuillin, *Municipal Corporations* § 3219 (3d ed.1999, rev.vol.). "When the right to exercise the power [of eminent domain] can only be made out by argument and inference, it does not exist." *Mack v. Town of Craig,* 68 Colo. 337, 339, 191 P. 101, 101 (1920); *see Dep't of Transp. v. Stapleton,* 97 P.3d 938 (Colo.2004) (quoting *Mack v. Town of Craig, supra,* with approval). Because we find nothing but "argument and inference" to support Cornerstone's statutory interpretation, we reject it.

### B. Common Law Delegation of the Power to Condemn

■ However, we agree with Cornerstone that the Authority's obligations under its agreements with Cornerstone may be enforced under principles of estoppel, and therefore we remand for further proceedings.

The URL also establishes certain steps that an urban renewal authority must have taken before exercising its eminent domain power. *See* § 31–25–104(1)(a), C.R.S.2005 (notice of hearing); § 31–25–104(1)(b), C.R.S. 2005 (findings and declaration).

Here, the trial court made no findings whether the Authority had taken such steps.

At oral argument, however, both parties agreed that all statutory conditions precedent to the Authority's condemnation petitions had been performed or had occurred.

Nevertheless, the Authority cites numerous cases holding that the power of eminent domain cannot be abridged by contract. *See, e.g., Contributors to Pa. Hosp. v. City of Philadelphia,* 245 U.S. 20, 23, 38 S.Ct. 35, 36, 62 L.Ed. 124 (1917)(to permit restraint of exercise of power of eminent domain "by contract would be a renunciation of power to legislate for the preservation of society"); *Chesapeake & Oh. Ry. v. Greenup County,* 175 F.2d 169, 173 (6th Cir.1949) ("The power of eminent domain is 'so inherently governmental in character and so essential for the public welfare' as not to be susceptible of abridgment by agreement."); *S. Ind. Gas & Elec. Co. v. City of Boonville,* 215 Ind. 552, 20 N.E.2d 648, 652 (1939) ("The power of eminent domain is an attribute of sovereignty.... It cannot be surrendered, and, if attempted to be contracted away, it may be resumed at will."); *In re Condemnation of 110 Wash. St.,* 767 A.2d 1154, 1159 (Pa. Commw.Ct.2001) (the power of eminent domain "may not be delegated by agreement or contract"); *City of Milwaukee v. Schomberg,* 261 Wis. 166, 52 N.W.2d 151, 152 (1952)("The power of eminent domain is inalienable and cannot be surrendered, ... to say nothing of the power of other governmental agencies to impair it or bargain it away.").

But to the extent these cases apply, rather than merely articulate, this principle, they do so in the context of agreements that preclude or otherwise restrict the exercise of eminent domain. *See also Pub. Serv. Co. v. City of Loveland,* 79 Colo. 216, 228, 245 P. 493, 499 (1926) (city lacked power to enter into contract not to condemn a particular piece of property).

As the trial court found, "[The Authority] did not relinquish its right to condemn property. On the contrary, [it] entered into a contract that affirmed its right to use its eminent domain power, if necessary."

Yet the Authority argues that, notwithstanding its unequivocal actions to condemn, before and after entering into the agreements with Cornerstone, those agreements are void ab initio as a matter of law because protecting the public welfare requires that the Authority be allowed to change its mind and abandon the condemnation actions against the four parcels. We are not persuaded that this issue can be resolved as a matter of law.

■ Just as the public welfare could be impaired by precluding a condemnor from exercising its eminent domain power, *Pub. Serv. Co. v. City of Loveland, supra,* it could also be impaired by precluding the condemnor from abandoning a condemnation proceeding. For example, the cost of acquiring a particular parcel might become disproportionate to any resulting public benefit. However, "[t]he right to abandon condemnation proceedings may be relinquished by agreement or lost by estoppel." *Piz v. Housing Auth.,* 132 Colo. 457, 466, 289 P.2d 905, 910 (1955); *see also Heimbecher v. City & County of Denver,* 90 Colo. 346, 9 P.2d 280 (1932).

Numerous jurisdictions recognize the general rule as stated in *Piz v. Housing Auth., supra. See, e.g., State ex rel. Morrison v. Helm,* 86 Ariz. 275, 345 P.2d 202 (1959); *Selle v. City of Fayetteville,* 207 Ark. 966, 184 S.W.2d 58 (1944); *Epperson v. Johnson,* 190 Okla. 1, 119 P.2d 818 (1941).

Here, the trial court acknowledged *Piz* but declined to follow it by distinguishing, as a matter of law, between "protection of an innocent and mistreated landowner" who has been dragged into a condemnation proceeding, and "the protection of Cornerstone's and Walgreens' ability to make a profit on this project." But neither *Piz* nor the authorities cited therein require this categorical distinction in all cases, regardless of their particular facts.

In concluding that the balance of equities favored injunctive relief, the trial court also found that "[b]oth Cornerstone and Walgreens have invested substantial time and money in this project." The court noted testimony that, "if Cornerstone cannot perform on this project, it could affect Walgreens' interest in doing new deals with Cornerstone." Thus, the record shows that the stakes for Cornerstone may go beyond merely "mak[ing] a profit on this project."

A condemnation award must put the landowner in the same economic position as if the property had not been taken. *See, e.g., Fowler Irrevocable Trust 1992–1 v. City of Boulder,* 17 P.3d 797 (Colo.2001). Likewise, money damages for breach of contract seek to put the nonbreaching party in the position it would have had but for the breach. *Carder, Inc. v. Cash,* 97 P.3d 174 (Colo.App. 2003).

Yet the testimony that Cornerstone's failure to complete this transaction *could deter* Walgreens, its principal client, from doing future business with it suggests harm to Cornerstone potentially greater than that suffered by a landowner whose property has been condemned. *Cf. Ditus v. Beahm,* 123 Colo. 550, 232 P.2d 184 (1951)(loss of future business from breach of covenant not to compete presumed irreparable for purposes of obtaining injunctive relief).

*Piz* rests on the premise that estoppel "will always be applied to prevent fundamental injustice." *Piz v. Housing Auth., supra,* 132 Colo. at 463, 289 P.2d at 908. We cannot say that the prejudice suffered by Cornerstone from its reliance on the Authority's conduct, as a matter of law, implicates "fundamental injustice" any less than the prejudice suffered by the landowners in cases such as *Piz* and *Heimbecher.*

We are not persuaded otherwise by *Joleewu, Ltd. v. City of Austin,* 916 F.2d 250 (5th Cir.1990), *vacated in part on other grounds,* 934 F.2d 621 (5th Cir.1991), which are cited by the trial court and the dissent. In *Joleewu,* the court held that a contract which "purported to dictate when the City must initiate condemnation proceedings" was unenforceable because the timing of acquisition of land for public purposes is a governmental function, and thus it could not be impeded by contract. *Joleewu, supra,* 916 F.2d at 255.

But the appellate court did not reach the promissory estoppel claim because it had been abandoned at oral argument. Further, the City of Austin had not "initiated any formal proceedings to condemn the property." *Joleewu, supra,* 916 F.2d at 251. In contrast, here the Authority had not only already made the decision to condemn, but it had also filed petitions.

Nor are we persuaded that this issue can be resolved as a matter of law on authority recognizing that "no compensation is possible for the subjective value of [condemned] lands to the individuals displaced and the indignity inflicted by uprooting them from their homes." *Kelo v. City of New London,* 545 U.S. 469, 521, 125 S.Ct. 2655, 2686, 162 L.Ed.2d 439 (2005)(Thomas, J., dissenting).

At this nascent stage of the proceedings, no record has been developed of third-party considerations such as subjective value or relocation indignity. Further, the trial court made no such findings on the evidence before it, but instead relied on a generalization about "innocent and mistreated" land owners to distinguish *Piz.*

In finding that the public interest favored an injunction against the Authority's using funds to enter into settlements with the four remaining landowners, the court was "sympathetic to the situations of the landowners, who were caught in the middle of this project." Nevertheless, the court concluded that "the benefit of the greater public good outweighs the disservice ... [to] the affected landowners." Presumably, the "public good" was enforcing the contracts at issue. *See, e.g., Aetna Health Mgmt., Inc. v. Mid–America Health Network, Inc.,* 975 F.Supp. 1382 (D.Kan.1997) (recognizing public interest in enforcing valid covenant not to compete).

In any event, because specific performance is a discretionary remedy, on remand the trial court may consider adverse impact on the remaining landowners. *Cf. Long v. Wright,* 70 Colo. 173, 197 P. 1016 (1921). But in our view the mere possibility of subjectively inadequate compensation to those landowners does not, as a matter of law, overcome Cornerstone's equities. Moreover, on remand the trial court may also consider whether specific performance, in a transaction of this nature, rises to the level of a "vested right" under *City of Golden v. Parker,* 138 P.3d 285 (Colo.2006), which was decided during the pendency of this appeal.

Accordingly, we conclude that the trial court erred in dismissing Cornerstone's specific performance claim.

## IV. Injunctive Relief

On cross-appeal, the Authority contends the trial court erred in preliminarily enjoining it from using certain assets for other projects. We disagree.

Preliminary injunctive relief is designed to protect a plaintiff from sustaining irreparable injury and to preserve the trial court's ability to render a meaningful decision following a trial on the merits. The power to grant a preliminary injunction "should be exercised sparingly and cautiously and with a full conviction on the part of the trial court of its urgent necessity." *Rathke v. MacFarlane*, 648 P.2d 648, 653 (Colo.1982).

A preliminary injunction is not warranted unless the trial court finds that the moving party has demonstrated the following: (1) the moving party has a reasonable probability of success on the merits; (2) a danger of real, immediate, and irreparable injury exists that may be prevented by injunctive relief; (3) the moving party has no plain, speedy, and adequate remedy at law; (4) the granting of a preliminary injunction will not disserve the public interest; (5) the balance of equities favors granting the injunction; and (6) the injunction will preserve the status quo pending a trial on the merits. *Rathke v. MacFarlane, supra.*

We review the trial court's preliminary injunction decision for an abuse of discretion. Under that standard, we examine the court's ruling to determine whether it is based on an erroneous application of the law or is otherwise manifestly arbitrary, unreasonable, or unfair. *Bloom v. Nat'l Collegiate Athletic Ass'n*, 93 P.3d 621 (Colo.App. 2004).

Here, with record support, the trial court found that Cornerstone satisfied all six prongs of the *Rathke* test.

### A. Reasonable Probability of Success

The Authority asserts that Cornerstone did not show a reasonable probability of success on the merits. The Authority argues that (1) the unenforceability, via specific performance, of the Authority's promise to exercise its condemnation power rendered the contracts null and void in their entirety; (2) the contracts were otherwise unenforceable because of impossibility or the parties' mutual mistake in believing that condemnation proceedings could be completed within six months of entering into the DDA; and (3) Cornerstone had materially breached the contracts. We are not persuaded.

Whether the provisions of a contract are severable depends on the intention of the parties, and where that intention is unmistakably revealed in a written instrument, it is a question of law. *See L.U. Cattle Co. v. Wilson*, 714 P.2d 1344, 1349 (Colo.App.1986).

Here, the DDA provided:

If any provision, covenant, agreement or portion of this Agreement, or its application ... is held invalid, such invalidity shall not affect the application or validity of any other provisions, covenants or portions of this Agreement and, to that end, any provisions, covenants, agreements or portions of this Agreement are declared to be severable.

Similarly, the LA provided, "If any provision of this Agreement shall be determined to be unenforceable, that shall not affect any other provision of this Agreement."

In light of this clear and explicit language regarding the severability of invalid or unenforceable clauses, we discern no error in the court's refusal to find the contracts null and void. *See, e.g., Alpha Real Estate Co. v. Delta Dental Plan*, 671 N.W.2d 213 (Minn.Ct. App.2003).

Nor do we perceive impossibility or mutual mistake to be grounds for overturning the trial court's ruling. These defenses may be waived by the conduct of the parties. *See Kerns v. Bank of Manitou*, 125 Colo. 320, 242 P.2d 817 (1952)(by its conduct, party may waive its right to rescind or otherwise defend against the enforcement of contract on grounds of mutual mistake of fact); *Hart v. Arnold*, 2005 PA Super 328, 884 A.2d 316, 335 (2005)(quoting *Ellwood City Forge Corp. v. Fort Worth Heat Treating Co.*, 431 Pa.Super. 240, 636 A.2d 219, 223 (1994): "Once impracticability of performance or frustration of purpose occurs, 'it is up to the parties to

waive the difficulties or seek to terminate the agreement.' ").

■ Here, the record contains evidence that the parties modified the project agreements several times to accommodate the Authority's inability to meet contract deadlines; that they were proceeding under the contracts as late as September 2004, sixteen months after they had entered into the DDA; and that Cornerstone was still willing, as of the time of the preliminary injunction hearing, to go forward on the project. Through its conduct, the Authority may have waived its right to avoid the contracts on the grounds of impossibility or mutual mistake of fact.

Finally, whether Cornerstone materially breached its obligations, excusing the Authority's nonperformance under the contracts, was a factual matter for the trial court to resolve. *See Lake Durango Water Co. v. Pub. Utils. Comm'n,* 67 P.3d 12, 21 (Colo. 2003) ("Whether a party has performed its obligations under a contract or breached is a question of fact."); *Kaiser v. Mkt. Square Disc. Liquors, Inc.,* 992 P.2d 636, 640 (Colo. App.1999) ("Whether a breach of a contract is material, and therefore excuses further performance by the other party, is a question of fact.").

The trial court determined that Cornerstone had most likely not materially breached its obligations. Because the sufficiency, probative effect, and weight of the evidence, and the inferences and conclusions drawn from it, are within the province of the trial court, we cannot disturb its determination. *See Interbank Invs., L.L.C. v. Vail Valley Consol. Water Dist.,* 12 P.3d 1224, 1231 (Colo.App.2000).

## B. The Authority's Other Assertions

■ We also reject the Authority's other assertions, namely that Cornerstone had a plain, speedy, and adequate remedy at law (damages), that the injunction did not serve the public interest, and that the injunction did not preserve the status quo pending a trial on the merits.

The trial court found: (1) "Given not only [the Authority's] present financial condition, and the lack of any evident guarantor, but also [the Authority's] actions that already have depleted its ability to answer in damages and that promise[ ] to do so further, the Court cannot conclude that Cornerstone has an adequate remedy at law without some form of injunctive protection"; (2) "[I]t does not disserve the interest of the public to require [the Authority] to preserve its ability to pay whatever damages might be awarded by a court of law"; and (3) "The injunction described below will do as much as this Court can do to preserve the status quo, i.e., the assets available to satisfy a potential damages judgment."

The evidence supports the trial court's findings on these matters, and, consequently, we conclude that the trial court did not abuse its discretion by entering a preliminary injunction against the Authority.

The judgment denying relief in the nature of specific performance is reversed, the preliminary injunction is affirmed, and the case is remanded for further proceedings consistent with this opinion.

Justice ROVIRA * concurs.

Judge DAILEY concurs in part and dissents in part.

Judge DAILEY concurring in part and dissenting in part.

I dissent from part III of the majority opinion. In my view, the trial court correctly determined that it could not grant relief in the nature of specific performance to Cornerstone.

The majority concludes that the Authority's obligations under the agreements may be enforced under principles of promissory estoppel. However, one of the elements of a promissory estoppel claim is that the promisee reasonably relied on the promise to its

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2005.

detriment. *Patzer v. City of Loveland*, 80 P.3d 908, 912 (Colo.App.2003).

"[A]s a general rule, 'those who deal with the Government are expected to know the law and may not rely on the conduct of government agents contrary to the law.' " *Emery Mining Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1416 (10th Cir.1984) (quoting *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 63, 104 S.Ct. 2218, 2225, 81 L.Ed.2d 42 (1984)).

As noted by one leading commentator, "the officers of a municipal corporation cannot confer public powers upon others, nor delegate legislative powers; nor can powers conferred upon, or which appertain, or properly belong, to any office or department be surrendered or transferred and be performed by others." 10 Eugene McQuillin, *Municipal Corporations* § 29.07 (3d ed.1999 rev. vol.).

"The power of eminent domain is an inherent attribute of the sovereignty of the state, to take or authorize the taking of any private property within its jurisdiction for public use to promote the general welfare, without the consent of the owner, upon payment of just compensation, according to the method prescribed by law." 11 McQuillin, *supra*, § 32.02 (2000 rev. vol.); *see also In re Condemnation of 110 Wash. St.*, 767 A.2d 1154, 1158–59 (Pa.Commw.Ct.2001)(quoting *Lance's Appeal*, 55 Pa. 16, 25–26 (1867): "The power arises out of that natural principle which teaches that private convenience must yield to the public wants.").

As the majority points out, state and federal cases alike hold that the power of eminent domain cannot be abridged by contract. And while the majority correctly posits that these cases involve situations where condemning authorities have agreed to refrain from condemning property, I see no reason why the rule announced in these cases should not also apply in cases where the condemning authority has purportedly bound itself to condemn certain property. In each instance, the governmental prerogative to decide whether condemnation is in the public interest is at stake; in each instance, the private interests seek ultimate control of the exercise of that prerogative. In my view, the analysis should not be any different when, as here, a private entity wants to control the governmental prerogative to take others' private property.

My conclusion finds support in *Joleewu, Ltd. v. City of Austin*, 916 F.2d 250 (5th Cir.1990), *vacated in part on other grounds*, 934 F.2d 621 (5th Cir.1991). In *Joleewu*, the United States Court of Appeals for the Fifth Circuit determined that a contract that purported to dictate when a city must initiate condemnation proceedings was unenforceable because the timing of acquisition of land for a public purpose is a governmental function which could not be impeded by contract. The court reasoned that "[i]f the acquisition of land for a public purpose is a governmental function, so is the decision about the timing of the acquisition." *Joleewu, supra*, 916 F.2d at 255. This reasoning supports the view that whether and when to condemn are governmental prerogatives that cannot be controlled by contract.

I reject the majority's conclusion that the Authority's right to abandon condemnation proceedings could be relinquished by agreement or lost by estoppel. As the trial court pointed out, the authorities upon which Cornerstone relies—including *Piz v. Housing Authority*, 132 Colo. 457, 465–67, 289 P.2d 905, 910 (1955)—involve disputes between condemning authorities and condemnee-landowners:

> The courts [in those cases] have stepped in to protect landowners in unique situations where the equities cry out for a remedy. Here, however, what is at stake is an exercise of the power of eminent domain to complete a project that the municipality has concluded does not serve a public purpose. The issue is not the protection of an innocent and mistreated landowner. Rather, it is the protection of Cornerstone's and Walgreens' ability to make a profit on this project.

For similar reasons, I find the authority upon which Cornerstone relies to be distinguishable and unpersuasive. In essence, Cornerstone wants to use a governmental prerogative, when the governmental entity no longer wishes to use that prerogative, to force unwilling landowners to give up their property.

The obvious problem with eminent domain is its coercive nature. . . .

The coercive nature of eminent domain is sometimes justified on the grounds that the government must pay "just compensation" when it takes property. . . .

But the constitutionally required just compensation that courts routinely award property owners when the government condemns their property is generally viewed as undercompensatory. . . . The owners of a condemned property are, by definition, not willing sellers. They may be unwilling to sell because the "fair market value" offered does not match the value of the property to them, either because they value the property more highly for sentimental reasons or because they are denied compensation for increments of value that willing sellers would probably insist upon, or at least bargain hard for, before entering into a transaction.

Charles E. Cohen, *Eminent Domain After Kelo v. City of New London: An Argument for Banning Economic Development Takings,* 29 Harv. J.L. & Pub. Pol'y 491, 536–38 (2006)(footnotes omitted) (mentioning, as examples of uncompensated value, an owner's "loss of the autonomy to refuse to sell at any price, even at a price exceeding his [or her] own valuation of the property," "sentimental attachment [to the property], unique suitability of the property to the owner's needs, relocation costs . . . and the aggravation of having to move"); *see also Kelo v. City of New London,* 545 U.S. 469, 521, 125 S.Ct. 2655, 2686, 162 L.Ed.2d 439 (2005)(Thomas, J., dissenting)("So-called 'urban renewal' programs provide some compensation for the properties they take, but no compensation is possible for the subjective value of these lands to the individuals displaced and the indignity inflicted by uprooting them from their homes."); Nicole Stelle Garnett, *The Public–Use Question as a Takings Problem,* 71 Geo. Wash. L.Rev. 934, 945 (2003) ("the measure of damages awarded in an eminent-domain proceeding—namely, the fair market value of the property—frequently fails to make property owners 'whole,' especially with respect to subjective losses" (footnote omitted)).

Here, Cornerstone wants to compel the specific performance of agreements, the consequences of which fall largely on persons not party to the agreements. In my view, Cornerstone can use neither contract nor estoppel principles to compel the Authority to impose the human costs of forced displacement upon unwilling landowners after the Authority has decided that the public interest no longer requires a taking of the property.

Consequently, I would uphold the trial court's determination that specific performance was not available to the extent that it depended on the exercise of the Authority's condemnation authority.